## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**DAVID DUCROS**                                          **CIVIL ACTION**

**VERSUS**                                                       **NO.  09-6977**

**N. BURL CAIN, WARDEN**                         **SECTION "D"(2)**
**LOUISIANA STATE PENITENTIARY**

## ORDER, AND
## AMENDED REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  It has since been reassigned to me.  Record Doc. No. 13.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary. See 28 U.S.C. § 2254(e)(2).[1]

For the following reasons, I recommend that the instant petition for habeas corpus relief be **DENIED** and the petition **DISMISSED WITH PREJUDICE**.

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

I.      FACTUAL AND PROCEDURAL BACKGROUND

The petitioner, David Ducros, is incarcerated in the Louisiana State Penitentiary

in Angola, Louisiana.[2]  On October 31, 2002, Ducros was indicted by a grand jury in

Orleans Parish for the second degree murder of Trenika Duncan.[3]  The Louisiana Fourth

Circuit Court of Appeal summarized the facts of the case as follows:

> On the morning of July 20, 2002, Ms. Duncan, who had spent the night elsewhere, returned home to her apartment.  When she knocked at the door, the oldest of her four children, David Ducros, Jr. ("David"), let her into the apartment.  Ms. Duncan asked the children if their father (her former boyfriend), Mr. Ducros, was still in the house.  The children told her that he was not. The second-oldest child, Davion (nicknamed Yannie), testified that Ms. Duncan told them to check the rooms of the apartment. Yannie and her brother David did as they were told, but they were not able to find Mr. Ducros anywhere.  Ms. Duncan then told the children to clean up their rooms.  As they were doing so, Ms. Duncan entered Yannie's room and instructed Yannie and David to lift up the mattress.  When they did so, they found Mr. Ducros hiding inside of the mattress.  Mr. Ducros, according to Yannie, had apparently taken a knife and hollowed out an area between the mattress and box springs; he then took some covers and a pillow and went under there.
>
> Detective David Walker, the lead investigator, confirmed Yannie's testimony on this point.  Detective Walker testified that when he went to the crime scene he checked the bed.  He observed that the box spring was turned to the underneath part, the supports were removed, and someone could hide inside and conceal themselves by pulling the mattress over them.  He further explained that Mr. Ducros was not hiding under the bed, but was hiding in the box support itself.
>
> According to Yannie, after Mr. Ducros jumped out of the mattress, he and Ms. Duncan began arguing over whether Mr. Ducros could stay in

---

[2]Rec. Doc. No. 3.

[3]St. Rec. Vol. 2 of 8, Indictment, 10/31/02.

the apartment with them; Mr. Ducros told Ms. Duncan that his momma had put him out and that he did not have anywhere else to stay. Shortly thereafter, Mr. Ducros and Ms. Duncan went outside and continued arguing there. Yannie neither followed them, nor saw Mr. Ducros stab Ms. Duncan.

David similarly testified that after they found Mr. Ducros under the mattress, Ms. Duncan began arguing with him and insisting that he could not stay at their apartment. According to David, when they went outside, Ms. Duncan was carrying her youngest child, Moonie, in her hands. Watching from his bedroom window, David observed his father stab his mother. David immediately ran outside. When he arrived at the spot where the stabbing occurred, David found Moonie crying on the ground. He witnessed Mr. Ducros flee in a blue car. He then entered the apartment of a neighbor, Raynetta Jones, that Ms. Duncan had gone into; however, by that time, Ms. Duncan had passed out. When asked if he was positive it was his father who stabbed his mother, David replied that he was "super positive."

Ms. Jones testified that she lived in the apartment a door down from Ms. Duncan. Ms. Jones stated that she knew Ms. Duncan and that she knew Mr. Ducros as the father of Ms. Duncan's four children. Ms. Jones testified that on the morning of July 20, 2002, at about 7:30 a.m., she was in her bathroom when she heard Ms. Duncan outside hollering, "David, stop." In response, Ms. Jones ran to her sliding patio glass door. From there, she witnessed Ms. Duncan sitting in the grass with Mr. Ducros standing over her with a knife in his hand. Moonie was lying on the grass nearby as if she had been dropped. Ms. Jones saw Mr. Ducros raise his hand and make repeated stabbing motions at Ms. Duncan. Ms. Jones then called 911, informing the operator that her next door neighbor had just been stabbed by her exboyfriend. According to Ms. Jones, Ms. Duncan then entered her apartment and stated: "He stabbed me. David stabbed me." Shortly thereafter, Ms. Duncan passed out on Ms. Jones' living room floor. The properly authenticated tape of the 911 call was played for the jury.

Detective Walker, who was the lead investigator, testified that he went first to Charity Hospital, where Ms. Duncan was taken. After learning that Ms. Duncan had died, Detective Walker spoke with Ms. Duncan's family, including her four children. With the grandparents' permission, Detective Walker formally interviewed Yannie and David at the police station. Following the interview, he obtained an arrest warrant for Mr. Ducros.

Later that day, Detective Walker received information that the blue car Mr. Ducros fled in was parked in the 13000 block of Dwyer.  When he arrived at that location, he observed a blue-green vehicle that had red streaks on the steering wheel.  He arranged to have the vehicle towed to Central Evidence and Property Cages at Headquarters and to obtain a warrant to search the vehicle.  After obtaining the warrant, the police searched the vehicle and found a blood stained white t-shirt inside the trunk.  The police also found a knife in the vehicle.  The crime lab personnel collected samples from apparent blood stains on the steering wheel and the driver's side door.

In addition to the evidence gathered from the vehicle and at the murder scene, the police recovered a bloody knife near a dumpster at the apartment complex where Ms. Duncan lived.

Ann Montgomery, the New Orleans Crime Lab Forensic DNA Technical Leader, was qualified as an expert in forensic DNA analysis.  She testified regarding the DNA testing that the police had done on samples collected from Mr. Ducros and Ms. Duncan, comparing them to some of the evidence that was collected.  Ms. Montgomery testified that Mr. Ducros could be excluded as the person whose blood was on the white t-shirt, but Ms. Duncan could not.  The blood found on the door handle and steering wheel of the vehicle was consistent with Ms. Duncan's DNA sample.  The bloody knife was not tested. In this regard, Ms. Montgomery testified that the Crime Lab has a policy that limits to five the number of items submitted for DNA testing per case.

Dr. Richard Tracy, an expert in forensic pathology, testified that he performed the autopsy on Ms. Duncan.  He opined that the cause of death was a stab wound to her chest that penetrated her lung.  Although she had multiple other stab wounds, the other wounds were superficial.  Among the superficial wounds were cuts on her left hand and wrists, which Dr. Tracy characterized as defensive wounds.  He explained that knife cuts or stabs on the hand are by definition called defensive wounds.

The defense presented no witnesses at trial.

State v. Ducros, 886 So.2d 702 (La. App. 4th Cir. 2005) (Table); State Record Volume 6 of 8, Louisiana Fourth Circuit Court of Appeal Opinion, 2004-KA-0336, pp. 2-6, November 3, 2004.

Prior to trial, Ducros's appointed counsel filed a motion to quash the indictment based on <u>State v. Dilosa</u>, 848 So.2d 546 (La. 2003), in which the Louisiana Supreme Court found the grand jury selection process in Orleans Parish impermissible under Louisiana law.[4]  The state trial court denied the motion on September 8, 2003.[5]  Later, on the order of the Louisiana Fourth Circuit, the state trial court issued a per curiam order on October 28, 2003, explaining that it denied the motion to quash because the grand jury in Ducros's case was not selected under the statutes questioned in <u>Dilosa</u>.[6]

Ducros's counsel sought review of the trial court's ruling in the Louisiana Fourth Circuit, and filed a motion to stay the criminal proceedings in that court.[7]  The appellate court later denied in separate orders the motion to stay and the writ application without stated reasons.[8] Counsel thereafter filed an emergency writ application with the Louisiana

---

[4]St. Rec. Vol. 2 of 8, Motion to Quash Grand Jury Indictment, undated.  In <u>Dilosa</u>, the Louisiana Supreme Court determined that La. Code Crim. P. art. 413(C) and La. Rev. Stat. Ann. § 15:114, regarding the selection process for grand jury panels and forepersons in Orleans Parish, was unconstitutional under the Louisiana Constitution because it was an impermissible local law.

[5]St. Rec. Vol. 1 of 8, Minute Entry, 9/8/03.

[6]St. Rec. Vol. 1 of 8, Trial Court Order, 10/28/03; St. Rec. Vol. 4 of 8, 4th Cir. Order, 2003-K-1728, 10/24/03.

[7]St. Rec. Vol. 4 of 8, 4th Cir. Writ Application, 2003-K-1728, 10/2/03; Motion for a Stay, 2003-K-1728, 11/7/03.

[8]St. Rec. Vol. 4 of 8, 4th Cir. Order, 2003-K-1728, 11/10/03; 4th Cir. Order, 2003-K-1728, 11/12/03.

Supreme Court seeking review of the denial of the motion to stay, which was promptly denied.[9]

Ducros was tried before a jury on November 12 and 13, 2003, and was found guilty as charged.[10]  On December 4, 2003, the state trial court sentenced Ducros to serve life in prison without benefit of parole, probation, or suspension of sentence.[11]  The record contains a motion to reconsider sentence, but there is no indication that it was decided.[12]

On direct appeal, Ducros's appointed counsel filed a brief with the Louisiana Fourth Circuit requesting errors patent review, and also stating, pursuant to Anders v. California, 386 U.S. 738 (1967), that there were no non-frivolous grounds for appeal.[13] The court allowed Ducros to file a pro se supplemental brief in which he argued that the indictment was unconstitutional in light of Dilosa, 848 So.2d at 546.[14]

---

[9]State v. Ducros, 858 So.2d 414 (La. 2003); St. Rec. Vol. 4 of 8, La. S. Ct. Order, 2003-KK-3114, 11/12/03.

[10]St. Rec. Vol. 1 of 8, Trial Minutes, 11/12/03; Trial Minutes, 11/13/03; St. Rec. Vol. 1 of 8, Jury Verdict, 11/13/03; St. Rec. Vol. 6 of 8, Trial Transcript, 11/12-13/03.

[11]St. Rec. Vol. 1 of 3, Sentencing Minutes, 12/4/03; St. Rec. Vol. 6 of 8, Sentencing Transcript, 12/4/03.

[12]St. Rec. Vol. 2 of 8, Motion to Reconsider Sentence, 12/9/03.

[13]St. Rec. Vol. 6 of 8, Appeal Brief, 2004-KA-0879, 3/25/04.

[14]St. Rec. Vol. 6 of 8, Pro Se Appeal Brief, 2004-KA-0336, 8/12/04.

On November 3, 2004, the Louisiana Fourth Circuit affirmed Ducros's conviction and sentence, finding no errors on the face of the record and finding that Ducros lacked standing to raise a <u>Dilosa</u> claim.[15]

On April 1, 2005, the Louisiana Supreme Court denied Ducros's subsequent writ application to that court without stated reasons.[16]  Ducros's conviction became final 90 days later, on June 30, 2005, when he did not file a writ application with the United States Supreme Court.  <u>Ott v. Johnson</u>, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)), <u>cert. denied</u>, 529 U.S. 1099 (2000); U.S. Sup. Ct. Rule 13(1).

On December 1, 2005, Ducros mailed an application for post-conviction relief to the state trial court, alleging ineffective assistance of trial counsel, insufficient evidence, and an improper reasonable doubt jury instruction.  Although the record does not contain a file-stamped copy of this application, according to Ducros's verified state court pleading later filed with the Louisiana Supreme Court, the application for post-conviction relief

---

[15]<u>State v. Ducros</u>, 886 So.2d at 702; St. Rec. Vol. 6 of 8, 4th Cir. Opinion, 2004-KA-0336, 11/3/04.

[16]<u>State v. Ducros</u>, 897 So.2d 600 (La. 2005); St. Rec. Vol. 7 of 8, La. S. Ct. Order, 2004-KO-3130, 4/1/05; La. S. Ct. Writ Application, 04-KO-3130, 12/16/04 (dated 11/30/04); St. Rec. Vol. 3 of 8, La. S. Ct. Letter, 2004-KO-3130, 12/17/04 (showing postal meter of 12/1/04).

was deemed filed in the state trial court on December 1, 2005.[17]  In addition, the State concedes that Ducros filed this post-conviction application in the state trial court on that date and the Louisiana courts deemed the application timely filed on that date.[18]

About two-and-one-half years later, Ducros wrote a letter to the clerk of the state trial court on April 3, 2008, inquiring about the status of his application for post-conviction relief.[19]  On August 27, 2008, the state trial court denied the application as time barred under La. Code Crim. P. art. 930.8.[20]

In reviewing that order, the Louisiana Fourth Circuit held that the trial court erred in finding that the application was untimely, noting the effects of Hurricane Katrina at the time Ducros's application had been submitted.[21]  However, the appellate court reviewed the merits of the claims raised in the application and denied relief.[22]  The Louisiana

---

[17]St. Rec. Vol. 8 of 8, La. S. Ct. Writ Application, 08-KH-2735 (signed verification on the writ application filing sheet dated 11/3/08), 11/17/08.

[18]Rec. Doc. No. 11, pp. 3, 6; St. Rec. Vol. 8 of 8, 4th Cir. Order, 2008-K-1227, 10/23/08; see also, St. Rec. Vol. 8 of 8, Certified Mail Receipt, 12/1/05.

[19]St. Rec. Vol. 1 of 8, Letter to Clerk of Court, 4/4/08 (dated 4/3/08).

[20]St. Rec. Vol. 8 of 8, Trial Court Order, 8/27/08.

[21]St. Rec. Vol. 8 of 8, 4th Cir. Order, 2008-K-1227, 10/23/08; 4th Cir. Writ Application, 2008-K-1227, 10/1/08 (dated 9/22/08).

[22]Id.

Supreme Court subsequently denied Ducros's related writ application without reasons on September 25, 2009.[23]

## II.   FEDERAL HABEAS PETITION

On November 4, 2009, the clerk of this court filed Ducros's petition for federal habeas corpus relief in which he asserted four grounds for relief:[24] (1) Trial counsel denied him the right to testify. (2) The evidence was insufficient to support the verdict. (3) Trial counsel provided ineffective assistance in failing to (a) independently test exculpatory evidence, (b) present a legitimate theory of defense, (c) call defense witnesses, and (d) object to the erroneous reasonable doubt charge. (4) The trial court gave a defective reasonable doubt instruction to the jury.

The State filed a response in opposition to Ducros's petition arguing that the claims are without merit.[25]  In his reply to the State's opposition response, Ducros restates his arguments in support of his four claims.[26]

---

[23]State ex rel. Ducros v. State, 18 So.3d (La. 2009); St. Rec. Vol. 8 of 8, La. S. Ct. Order, 2008-KH-2735, 9/25/09; La. S. Ct. Writ Application, 08-KH-2735, 11/17/08 (postal metered 11/5/08, dated 11/3/08).

[24]Rec. Doc. No. 3.

[25]Rec. Doc. No. 11.

[26]Rec. Doc. No. 12.

III.   GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996[27] and applies to habeas petitions filed after that date.  Flanagan v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)).  The AEDPA therefore applies to Ducros's petition, which, for reasons discussed below, is deemed filed in this federal court on October 5, 2009.[28]

The threshold questions in habeas review under the AEDPA are whether the petition is timely filed and whether the claims raised by the petitioner were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies

---

[27]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

[28]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. Coleman v. Johnson, 184 F.3d 398, 401 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000); Spotville v. Cain, 149 F.3d 374, 378 (5th Cir. 1998); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995).  The clerk of court filed Ducros's petition on November 4, 2009, when the filing fee was paid.  Ducros's signature on the petition and memorandum in support are dated October 5, 2009.  I consider this to be the earliest date on which he could have delivered the pleadings to prison officials for mailing.  The fact that he paid the filing fee on a later date does not alter the application of the federal mailbox rule to his pro se petition.  See Cousin v. Lensing, 310 F.3d 843 (5th Cir. 2002) (mailbox rule applies even if inmate did not pay the filing fee at the time of mailing) (citing Spotville, 149 F.3d at 374).

and must not be in "procedural default" on a claim.  Nobles v. Johnson, 127 F.3d 409,

419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

In this case, the State concedes, and I find, that the federal petition was timely filed,

Ducros's claims are exhausted and none are in procedural default.

IV.   STANDARDS OF A MERITS REVIEW

28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions

of fact, questions of law and mixed questions of fact and law in federal habeas corpus

proceedings.  Nobles, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be

correct . . . and we will give deference to the state court's decision unless it 'was based

on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding.'"  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28

U.S.C. § 2254(d)(2)), cert. denied, 532 U.S. 1039 (2001).  The amended statute also

codifies the "presumption of correctness" that attaches to state court findings of fact and

the "clear and convincing evidence" burden placed on a petitioner who attempts to

overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and

fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state

court's decision "'was contrary to, or involved an unreasonable application of, clearly

established [Supreme Court precedent.]'" <u>Penry v. Johnson</u>, 215 F.3d 504, 507 (5th Cir.
2000) (quoting <u>Miller v. Johnson</u>, 200 F.3d 274, 280-81 (5th Cir.), <u>cert. denied</u>, 531 U.S.
849 (2000)), <u>aff'd in part, rev'd in part on other grounds</u>, 532 U.S. 782 (2001); <u>Hill</u>, 210
F.3d at 485.  The United States Supreme Court has clarified the Section 2254(d)(1)
standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if
> the state court arrives at a conclusion opposite to that reached by this Court
> on a question of law or if the state court decides a case differently than this
> Court has on a set of materially indistinguishable facts.   Under the
> "unreasonable application" clause, a federal habeas court may grant the writ
> if the state court identifies the correct governing legal principle from this
> Court's decisions but unreasonably applies that principle to the facts of the
> prisoner's case.

<u>Williams v. Taylor</u>, 529 U.S. 362, 405-06, 412-13 (2000);  <u>Penry</u>, 532 U.S. at 792-93;
<u>Hill</u>, 210 F.3d at 485.  "'A federal habeas court may not issue the writ simply because that
court concludes in its independent judgment that the state court decision applied [a
Supreme Court case] incorrectly.'" <u>Price v. Vincent</u>, 538 U.S. 634, 641 (2003) (quoting
<u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002)) (brackets in original); <u>Bell v. Cone</u>,
535 U.S. 685, 699 (2002).  Rather, under the "unreasonable application" standard, "the
only question for a federal habeas court is whether the state court's determination is
objectively unreasonable."   <u>Neal v. Puckett</u>, 286 F.3d 230, 246 (5th Cir. 2002), <u>cert.</u>
<u>denied</u>, <u>sub nom</u>, <u>Neal v. Epps</u>, 537 U.S. 1104 (2003). The burden is on the petitioner to
show that the state court applied the precedent to the facts of his case in an objectively

unreasonable manner.  <u>Price</u>, 538 U.S. at 641 (quoting <u>Woodford</u>, 537 U.S. at 24-25);

<u>Wright v. Quarterman</u>, 470 F.3d 581, 585 (5th Cir. 2006).

## V.    SUFFICIENCY OF THE EVIDENCE (CLAIM NO. 2)

Ducros alleges that the evidence presented at trial did not prove that he committed

second degree murder.  He argues that the State failed to prove that the stabbing was not

simply manslaughter or the result of self-defense.  He suggests that, because the State

failed to test the knife for DNA and fingerprints, the prosecution failed to prove that he

did not act in self-defense or in the heat of passion.  Ducros also claims that the jury

disregarded the fact that he was provoked when the victim told him that he was not the

father of the children, and he had been struck in the head by the neighbor, Ms. Jones,

causing him to become disoriented before the stabbing. He argues that these

circumstances caused him to lose his self-control, and there was no proof of specific or

general intent to kill.  He also claims that the victim threatened him with the knife and in

the course of their argument, the victim ran toward him and was stabbed.   Ducros

contends that manslaughter was all that was proven at trial.

He raised this claim in his application for post-conviction relief, and the claim was

denied without stated reasons by the Louisiana Fourth Circuit.  The Louisiana Supreme

Court also denied his related writ application without providing reasons.

Under Jackson v. Virginia, 443 U.S. 307 (1979), the court must determine, after viewing the evidence in the light most favorable to the prosecution, whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. Jackson, 443 U.S. at 319; Gilley v. Collins, 968 F.2d 465, 467 (5th Cir. 1992); Guzman v. Lensing, 934 F.2d 80, 82 (5th Cir. 1991). Thus, to determine whether the commission of a crime is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law. Alexander v. McCotter, 775 F.2d 595, 597-98 (5th Cir. 1985); Turner v. McKaskle, 775 F.2d 999, 1001 (5th Cir. 1983). The court's consideration of the sufficiency of the evidence extends only to what was presented at trial. Guzman, 934 F.2d at 82 (citing Tyler v. Phelps, 643 F.2d 1095, 1102 (5th Cir. 1981)).

Review of the sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury. United States v. Young, 107 Fed. Appx. 442, 443 (5th Cir. 2004) (citing United States v. Garcia, 995 F.2d 556, 561 (5th Cir. 1993); see also Jackson, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). Thus, all credibility choices and conflicting inferences are to be resolved in favor of the verdict. Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005).

A reviewing federal habeas court is <u>not</u> authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses for that of the fact-finder.  <u>Alexander</u>, 775 F.2d at 598.

A claim of insufficient evidence presents a mixed question of law and fact.  <u>Maes v. Thomas</u>, 46 F.3d 979, 988 (10th Cir. 1995).  Therefore, this court must examine whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

In this case, Ducros suggests that the evidence was only sufficient to prove manslaughter.  The applicable legal standard, however, requires that this court consider only whether the evidence was sufficient to prove second degree murder, which was the verdict in this case.

Second degree murder is defined in relevant part by Louisiana law as "the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm; or (2) when the offender is engaged in the perpetration or attempted perpetration of . . . armed robbery, first degree robbery, second degree robbery, simple robbery . . . even though he has no intent to kill or to inflict great bodily harm."[29] La. Rev. Stat. Ann. § 14:30.1(A)(1).  The phrase "specific intent" is defined as the state of mind in which the perpetrator "actively desired the prescribed criminal consequences to follow

---

[29]The specific intent to inflict great bodily harm is enough to support a conviction for second degree murder.  <u>See</u> <u>State v. Mitchell</u>, 772 So.2d 78, 82 (La. 2000).

his act or failure to act." La. Rev. Stat. Ann. § 14:10(1).  Under Louisiana law, intent need not be proven directly but may be inferred from the actions of the defendant and the circumstances surrounding those actions.  <u>State v. Sharlhorne</u>, 554 So.2d 1317, 1321 (La. App. 1st Cir. 1989); <u>State v. Tate</u>, 851 So.2d 921, 930 (La. 2003) (citing <u>State v. Brooks</u>, 505 So.2d 714, 717 (La. 1987)).  Specific intent to kill can be implied by the intentional use of a deadly weapon, such as a knife or a gun.  <u>State v. Collins</u>,43 So.3d 244, 251 (La. App. 1st Cir. 2010), citing <u>State v. Brunet</u>, 674 So.2d 344, 349 (1996).

With respect to self-defense, Louisiana law provides that a homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.  La. Rev. Stat. Ann. § 14:20(1).  However, a person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense, unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.  La. Rev. Stat. Ann. § 14:21.  While there is no requirement that the defendant actually retreat from the confrontation, the possibility of escape is a factor to be considered in determining if the defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger.  <u>State v. Woodhead</u>, 866 So.2d 995, 1000 (La. App. 5th Cir. 2004).

Under Louisiana law, the burden of proof is on the State to prove that a murder was not committed in self-defense:

> [W]hen an accused raises self-defense, the burden is on the State to prove, beyond a reasonable doubt, that he did not act in self-defense. "The determination of a defendant's culpability focuses on a two fold inquiry: 1) whether, from the facts presented, the defendant could have reasonably believed his life to be in imminent danger, and 2) whether deadly force was necessary to prevent the danger." State v. Mills, 04-489, p. 7 (La. App. 5 Cir. 3/29/05), 900 So.2d 953, 959, writ denied, 05-1470 (La.1/13/06), 920 So.2d 235. "Factors to consider in determining whether a defendant had a reasonable belief the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing and the Defendant's knowledge of the assailant's bad character." State v. Nelson, 34,077, p. 6 (La. App. 2 Cir. 12/6/00), 775 So.2d 579, 584.

State v. Johnson, 948 So.2d 1229, 1234 (La. App. 3rd Cir.), writs denied, 965 So.2d 398, 399 (La. 2007).

In this case, the jury heard testimony and received evidence as follows: Police officers were called to the apartment complex to investigate a stabbing reported by the victim's neighbor, Raynetta Jones.[30]  Jones had known the victim, Ms. Duncan, for two years, and knew Ducros to be the father of Duncan's children.[31]  Duncan and Ducros had four children, David or "Little David" (age 9), Davion or "Yannie" (age 8),  Daviyon or "Nene" (age 6), and Davanee or "Moonie" (age 4), all of whom were home at the time of

---

[30]St. Rec. Vol. 6 of 8, Trial Transcript, p. 143 (Raynetta Jones), 11/12-13/03.

[31]Id.

17

the stabbing.[32]   Duncan spent the night before the stabbing away from home out of concern that Ducros would harm her.[33]

When Duncan returned in the morning, she had the children search to assure that Ducros was not in the house.[34]  There was a plumbing panel in the wall in Yannie's room, which Duncan believed Ducros used to get into the house.[35]  Duncan had the children move the mattress in Yannie's room, and they found Ducros hiding in the box spring casing, which he had converted into a hiding place.[36]

Duncan and Ducros began arguing about him being in the apartment and needing to leave.[37]  The children heard Ducros say that he had been put out of his mother's home, and Duncan told him he could not stay in her home.[38]  They continued to argue as they

---

[32]Id., pp. 129, 130-31 (Davion Duncan), p. 158 (David Ducros Jr.).

[33]Id., pp. 138-39 (Davion Duncan).

[34]Id., p. 133 (Davion Duncan), pp. 160-61 (David Ducros Jr.).

[35]Id., pp. 133-34 (Davion Duncan), pp. 55, 76 (Detective Walker).

[36]Id., p. 134 (Davion Duncan), p. 161 (David Ducros Jr.), pp. 55, 76 (Detective Walker).

[37]Id., p. 135 (Davion Duncan), pp. 161-62 (David Ducros Jr.).

[38]Id., p. 135 (Davion Duncan), pp. 161-62 (David Ducros Jr.).

moved down the stairs and outside.[39]  By this time, Duncan was carrying Moonie in her arms.[40]

David continued to watch his parents argue as he looked out of his bedroom window.[41]  Raynetta Jones also heard Duncan outside calling out for Ducros to stop, and she looked through her sliding glass patio door.[42]  Jones saw Ducros standing over Duncan, who was seated on the ground with Moonie next to her as if she had been dropped there.  Ducros was telling Duncan to get up.[43]  When Jones called out for Ducros to stop, he looked up at her and she saw a knife in his hand.[44]  Ducros then pulled his arm back and began to stab Duncan.[45]  David was still watching his parents, and he too saw Ducros pull his arm back and stab Duncan twice.[46]  He then ran downstairs to go outside.[47]

---

[39]Id., p. 136 (Davion Duncan), pp. 162 (David Ducros Jr.).

[40]Id., p. 162 (David Ducros Jr.).

[41]Id.

[42]Id., p. 144 (Raynetta Jones).

[43]Id.

[44]Id.

[45]Id.

[46]Id., pp. 163, 169 (David Ducros Jr.).

[47]Id., p. 163 (David Ducros Jr.).

In the meantime, Jones turned her head and went to the telephone to dial 9-1-1.[48] As she returned to the patio door, Jones's friend, Johnny Green, had let Duncan in and she told Jones that Ducros had stabbed her.[49] Duncan briefly moved around the apartment and then passed out in the hallway, where she died.[50]

About that time, David arrived, and he stayed with his mother until Jones made him leave the room.[51]  He had also seen Ducros drive off in a "silk blue car" by way of the driveway next to the dumpster.[52]

Both Jones and David described the knife as long and thin with a black handle.[53] On a tip, the police later located a blood-stained knife, which matched that description, near a dumpster at the complex.[54] After receiving another call, police located Ducros's

---

[48]Id., pp. 145, 148 (Raynetta Jones).

[49]Id., p. 146 (Raynetta Jones).

[50]Id.

[51]Id., pp. 163, 165 (David Ducros Jr.).

[52]Id., p. 164 (David Ducros Jr.).

[53]Id., p. 151 (Raynetta Jones), p. 163 (David Ducros Jr.).

[54]Id., pp. 42-43 (Officer Scanyo).  The knife was admitted as State's Exhibit No. 9.  Id., p. 94.

car.[55]  Officers obtained blood stain samples and a bloody t-shirt from the car.  DNA testing on these items matched Duncan.[56]

According to the forensic pathologist, Duncan had at least nine cuts and stab wounds on her body.[57]  The fatal stab wound penetrated her chest about four inches, pierced her right lung and opened large blood vessels, causing rapid blood loss and air to enter the chest cavity.[58]  She also had several defensive wounds to her hands and wrist.[59] The pathologist estimated the knife to be one inch across and at least four inches from the tip to the handle, gradually tapering towards the point.[60] He made this determination based on the wounds, without being told that a knife was used or that a knife had been found.[61] An autopsy disclosed no evidence of alcohol or street drugs in the victim.[62]

Based on this record, the jury had ample evidence and testimony for which to conclude that Ducros committed second degree murder.  Duncan and Ducros argued about

---

[55]Id., p. 59 (Detective Walker).

[56]Id., pp. 62, 69 (Detective Walker), pp. 111-112 (Ann Montgomery).

[57]Id., pp. 86, 88-89 (Dr. Tracy).

[58]Id.

[59]Id., p. 89 (Dr. Tracy).

[60]Id.

[61]Id., p. 90 (Dr. Tracy).

[62]Id., p. 91 (Dr. Tracy).

his presence in her home.  After the argument moved outside, Ducros was seen standing over Duncan with a knife in his hand.  Duncan was sitting on the grass calling out for Ducros to stop.  After a neighbor also called out for him to stop, Ducros stabbed Duncan.  Their son, David, saw Ducros stab Duncan twice.  The autopsy revealed that Duncan had at least nine cuts and stab wounds.  The wounds were caused by a knife similar to the one found near the dumpster at the apartment complex where the killing occurred.  Duncan's blood also was found in Ducros's car and on the t-shirt in the trunk.  This was the same car in which he left the scene of the stabbing.

Based on a review of the record, the evidence viewed in a light most favorable to the prosecution, was more than sufficient to establish that Ducros had the requisite intent to kill or cause great bodily harm to Duncan, who died as a result of the stabbing.  Ducros inflicted multiple cuts and stab wounds, one of which caused the victim to die from excessive loss of blood.  The stabbing nature of the attack is sufficient to prove the requisite level of intent.  Both the neighbor and Ducros's son identified him as the only person in the yard with Duncan and as the person who stabbed her multiple times.

The victim's numerous cuts and stab wounds are contrary to any suggestion that Ducros was defending himself from her.  Ducros was standing over Duncan, as she sat on the ground calling out for him to stop.  He clearly had the opportunity to retreat from the situation; instead, he became the aggressor.  Duncan's position on the ground and the

multiple wounds also indicate that Ducros was not the one in danger.  The evidence did not demonstrate that he had to stab her multiple times to defend himself, a showing that was required under Louisiana law to prove self-defense.  The State's evidence, therefore, showed that Ducros was not acting in self-defense.

The state court's denial of relief on this claim was not contrary to, or an unreasonable application of <u>Jackson</u>.  Ducros is not entitled to relief on this claim.

## VI.   REASONABLE DOUBT JURY INSTRUCTION (CLAIM NO. 4)

Ducros alleges that the trial court gave a defective reasonable doubt charge to the jury in violation of his due process rights.  Ducros argues that the court used a disapproved phrase requiring "good reason" for a juror's doubts.  He further argues that this, coupled with the court's awkward explanation of reasonable doubt, violated constitutional standards.

Ducros raised this claim in his application for post-conviction relief. The Louisiana Fourth Circuit summarily rejected it, though no reasons were given, and the Louisiana Supreme Court also denied his related writ application without providing reasons.

To establish a constitutional error arising from the language of a jury charge, a petitioner must prove that the instructions, read as a whole, relieved the State of its burden to prove each element of the crime beyond a reasonable doubt in violation of the principles set forth in <u>In re Winship</u>, 397 U.S. 358 (1970).  <u>See</u> <u>Francis v. Franklin</u>, 471

U.S. 307 (1985).  If the charge is erroneous, the Supreme Court has also held that the error is subject to a harmless error analysis.  California v. Roy, 519 U.S. 2 (1996).  In Roy, the Supreme Court concluded that its decision in Brecht v. Abrahamson, 507 U.S. 619 (1993), articulated the appropriate legal standard for determining whether a trial error was harmless in a federal habeas challenge to a jury charge.  Roy, 519 U.S. at 6 (citing O'Neal v. McAninch, 513 U.S. 432, 436 (1995)).  That standard provides that a federal habeas court may not grant relief on trial errors unless the petitioner demonstrates that there is a reasonable likelihood that the error "had a substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637-38; O'Neal, 513 U.S. at 436.

Prior to its decision in Brecht, the Supreme Court considered the standard of review applicable to jury charge challenges in Estelle v. McGuire, 502 U.S. 62, 72-73 (1991). In Estelle, the Court held that the "reasonable likelihood" standard applies to jury charge error and disapproved of the "could have" or "would have" standard previously employed in Cage v. Louisiana, 498 U.S. 39 (1990) and Yates v. Evatt, 500 U.S. 391 (1991). Estelle, 502 U.S. at 71 n.4 (reaffirming Boyde v. California, 494 U.S. 370, 380 (1990)).

Therefore, this court, on habeas review, is required first to determine whether the instructions given at trial amounted to constitutional error and, if so, whether the error was harmless.  The burden of proof is on the petitioner to prove both the error and the

constitutional violation.  Cupp v. Naughten, 414 U.S. 141, 146 (1973).  Ducros has failed

to meet this burden.

The Constitution neither prohibits trial courts from defining reasonable doubt nor

requires them to do so as a matter of course.  Victor v. Nebraska, 511 U.S. 1, 5-6 (1994)

(citing Hopt v. Utah, 120 U.S. 430, 440-441 (1887)).  The due process standard also does

not require the use of any specific wording or formulation; all that is required is that the

jury be instructed to find the defendant's guilt beyond a reasonable doubt.  Id., 511 U.S.

at 5.

In Ducros's trial, the state trial court gave the following jury instruction on the

definition of reasonable doubt:[63]

> If you entertain any reasonable doubt as to any facts or elements
> necessary to constitute the defendant's guilt, it is your sworn duty to give
> him the benefit of that doubt and return a verdict of not guilty.  Even where
> the evidence demonstrates a probability of guilt, yet if it does not establish
> it beyond a reasonable doubt you must acquit the accused.
>
> This doubt must be a reasonable one.  That is one that is founded
> upon a tangible basis.  It is not upon a mere caprice, or a fancy, or a
> conjecture.  It must be such a doubt that it would give rise to an uncertainty
> raised in your mind by the reason of the unsatisfactory character of the
> evidence, one that would make you feel that you did not have an abiding
> conviction of the defendant's guilt.
>
> If after giving a fair and impartial consideration to all of the facts in
> the case, if you find the evidence unsatisfactory upon any single point
> indispensably necessary to constitute the defendant's guilt, this would give
> rise to such a reasonable doubt as justifying returning a verdict of not guilty.

––––––––––––––––––

[63]St. Rec. Vol. 6 of 8, Trial Transcript, pp. 178-80, 11/12-13/03.

The prosecution must establish guilt by legal and sufficient evidence beyond a reasonable doubt. But, the rule does not go further and require a preponderance of the testimony. It is incumbent upon the State to prove the offense charged or legally included in the indictment to your satisfaction beyond a reasonable doubt.

Ladies and gentlemen, a reasonable doubt is not a mere possible doubt. It should be an actual doubt. It is such a doubt that a reasonable man would seriously entertain. It is a serious doubt for which you can give a good reason.

[. . .]

Now, if you remember in the beginning when we were picking the jury and I was explaining to you in my own words what a reasonable doubt was, and I used - - - I said that if you were back in the jury room, the twelve of you, and someone said, "I have a doubt." The other eleven people can ask the question, why do you have that doubt about the case in its entirety or by an element that has to be proved by the State. And, if someone says, "I have a doubt because of insufficient evidence. I don't believe the witness." And, they can articulate and say why they have a doubt, that is a reasonable doubt.

It is the obligation of the people sitting at this chair over here to prove it beyond that. But, in the charges that I read to you, it says that it is not a doubt that is mere caprice, a fancy or a conjecture. It can't be such a thing as a feeling. So, if someone says that they have a doubt, and you say why do you have a doubt, and they say, "I just have a feeling. I feel funny about it. Whatever it is. I just don't feel comfortable with this." That's not a reasonable doubt. A reasonable doubt is when you have a doubt and you can express a logical reason for that doubt.

Ducros objects to the state trial court's use of the phrase "serious doubt for which you can give a good reason," in light of the court's commentary in the last two paragraphs quoted above. The challenged charge is referred to by the United States Fifth Circuit as the "articulation requirement," where a juror would be asked to state a reason for the doubt. See Muhleisen v. Ieyoub, 168 F.3d 840, 844 (5th Cir. 1999). The United States

26

Supreme Court has expressed no concern with this language that would warrant review or relief under the AEDPA.  See Williams v. Cain, 229 F.3d 468, 476 (5th Cir. 2000), cert. denied, 534 U.S. 829 (2001) (citing Muhleisen, 168 F.3d at 844 n.2); see also Quatrevingt v. Cain, 277 F.3d 1374, 2001 WL 1485849, at *5 n.10 (5th Cir. Nov. 15, 2001) (Table, Text in Westlaw) ("The so-called 'articulation requirement' [a serious doubt for which you can give a good reason] need not detain us. The Supreme Court has never expressed concern with this phrase. Although this court has expressed some doubt, our thoughts on the matter are irrelevant under AEDPA.").   In fact, the Supreme Court has long recognized that "[a] 'reasonable doubt,' at a minimum, is one based upon 'reason.'" Victor, 511 U.S. at 17 (quoting Jackson v. Virginia, 443 U.S. 307, 317 (1979)).  Thus, the use of such language to define reasonable doubt is not contrary to federal law.

The jury instruction given by the state trial court at Ducros's trial does not employ any of the problematic phraseology previously addressed by the Supreme Court, such as "moral certainty," "grave uncertainty" or "substantial doubt."  Cage, 498 U.S. at 39.  I note that the court's use of the term "actual doubt" in the context of the charge as a whole also was not prohibited language under either Cage or Victor, since it was not tied to "substantial doubt" or "moral certainty."  Sepulvado v. Cain, 58 Fed. Appx. 595, 2003 WL 261769, at *7-8 (5th Cir. Jan. 13, 2003).  Ducros has not established that the charge

given by the state trial court was unconstitutional.  Without proof of a trial error, this claim must fail.

The state courts' denial of relief on this claim was neither contrary to nor an unreasonable application of Supreme Court precedent.  Ducros is not entitled to relief on this claim.

VII.   INEFFECTIVE ASSISTANCE OF COUNSEL (CLAIMS NOS. 1 AND 3)

Ducros alleges that his trial attorneys provided ineffective assistance of counsel because they denied him the right to testify, they failed independently to test exculpatory evidence, they presented a bogus theory of defense, they failed to call defense witnesses, and they did not object to the trial court's erroneous reasonable doubt charge.  Ducros raised this claim in his application for post-conviction relief.  The Louisiana Fourth Circuit and the Louisiana Supreme Court did not state reasons for their denial of relief on this claim.

The issue of ineffective assistance of counsel is a mixed question of law and fact. Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir. 1994).  Thus, the question before this court is whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

The standard for judging performance of counsel was established by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), in which the

28

Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel, requiring petitioner to prove both deficient performance and resulting prejudice.  Strickland, 466 U.S. at 697.  The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-88.  Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.  Kimler, 167 F.3d at 893. A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.'  It is not enough under Strickland, however, 'that the errors had some conceivable effect on the outcome of the proceeding.'" Motley, 18 F.3d at 1226 (quoting Strickland, 466 U.S. at 693).

On federal habeas review, scrutiny of counsel's performance "must be highly deferential," and the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." Moore v. Johnson, 194 F.3d 586, 591 (5th Cir. 1999)

(citing Strickland, 466 U.S. at 689-90).  In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial.  Strickland, 466 U.S. at 689; Neal v. Puckett, 286 F.3d at 236-37; Clark v. Johnson, 227 F.3d 273, 282-83 (5th Cir. 2000), cert. denied, 531 U.S. 1167 (2001).  "A court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight."  Bell, 535 U.S. at 697 (citing Strickland, 466 U.S. at 689).

This court must apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 690.  Federal courts have consistently recognized that tactical decisions when supported by the circumstances are objectively reasonable and do not amount to unconstitutionally deficient performance.  Lamb v. Johnson, 179 F.3d 352, 358 (5th Cir. 1999), cert. denied, 528 U.S. 1013 (1999) (citing Rector v. Johnson, 120 F.3d 551, 564 (5th Cir. 1997) and Mann v. Scott, 41 F.3d 968, 983-84 (5th Cir. 1994)).  Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven

otherwise.  <u>Strickland</u>, 466 U.S. at 689; <u>Moore v. Johnson</u>, 194 F.3d at 591.  The burden

is on petitioner to demonstrate that counsel's strategy was constitutionally deficient.  <u>Id</u>.

A.    <u>THE RIGHT TO TESTIFY</u>

Ducros alleges that his counsel refused to let him testify, telling him it was their

decision.  He claims that this denied him the opportunity to tell his version of the events,

which would have included proof of his "cool reflection" and that he was not threatening

or violent during the argument.[64]  He also wanted the jury to hear that Duncan armed

herself with a knife and that he was only defending himself from her threats.  He also

suggests that the neighbor, Raynetta Jones, actually came out and hit him with something,

which caused him to become disoriented before the stabbing occurred.

It is well settled that a criminal defendant has the right to testify on his own behalf

pursuant to the Fifth, Sixth and Fourteenth Amendments.  <u>Rock v. Ark.</u>, 483 U.S. 44, 49

(1987); <u>Bower v. Quarterman</u>, 497 F.3d 459, 473 (5th Cir. 2007); <u>Sayre v. Anderson</u>, 238

F.3d 631, 634 (5th Cir. 2001); <u>Jordan v. Hargett</u>, 34 F.3d 310, 312 (5th Cir.1994).  When,

as here, the petitioner alleges that his counsel, not the court or the State, prevented him

from testifying, the United States Court of Appeals for the Fifth Circuit has held that the

"'appropriate vehicle for such claims is a claim of ineffective assistance of counsel.'"

<u>Sayre</u>, 238 F.3d at 634 (quoting <u>U.S. v. Brown</u>, 217 F.3d 247, 258-59 (5th Cir. 2000)).

---

[64]Rec. Doc. No. 3-1, p. 12.

A criminal defendant can only waive his right to testify if that waiver is knowing, intelligent and voluntary.  Bower, 497 F.3d at 473 (citing Emery v. Johnson, 139 F.3d 191, 198 (5th Cir. 1997)).  A violation of this right occurs only if the "'final decision that [the defendant] would not testify was made against his will.'"  Emery, 139 F.3d at 198 (quoting U.S. v. Teague, 908 F.2d 752, 759 (11th Cir. 1990)).

A habeas petitioner has the burden of proving that he was denied this constitutional right.  "[A] petitioner in a habeas proceeding cannot prevail on such a claim merely by stating to the habeas court that he told his trial attorney that he wished to testify and that his attorney forbade him from taking the witness stand."  Turcios v. Dretke, No. H-97-0515, 2005 WL 3263918, at *6 (S.D. Tex. Nov. 29, 2005) (citing Underwood v. Clark, 939 F.2d 473, 475-76 (7th Cir. 1991)); accord Jones v. Cain, No. 10-213, 2010 WL 5375949, at *3 (E.D. La. Dec. 17, 2010) (Vance, J.); Davis v. Quarterman, No. H-06-3606, 2007 WL 1886272, at *6 (S.D. Tex. June 29, 2007).

The Underwood court specifically noted the potential problems that were bound to arise if habeas petitioners, making similar arguments, are not required to satisfy the required burden of proof.  Underwood, 939 F.2d at 475-76.  Adopting the reasoning in Siciliano v. Vose, 834 F.2d 29, 31 (1st Cir. 1987), the Underwood court recognized that such an assertion, even if made under oath,

> is insufficient to require a hearing or other action on his claim that his right
> to testify in his own defense was denied him.  It just is too facile a tactic to

be allowed to succeed.  Some greater particularity is necessary – and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify – to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

Underwood, 939 F.2d at 475-76; accord Gross v. Knight, 560 F.3d 668, 672 (7th Cir.),

cert. denied, 130 S. Ct. 402 (2009).

Citing Underwood, the Fifth Circuit has

observed that allowing a bare assertion of a right-to-testify violation to precipitate the further investment of judicial resources is problematic.  See [Underwood, 939 F.2d at 476] . . . (stating that a conclusory assertion by a defendant that his right to testify was denied him is insufficient to require a hearing because "[i]t just is too facile a tactic to be allowed to succeed"). We agree that there is "a grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right . . . to testify in his own behalf without rendering the criminal process unworkable."

U.S. v. Martinez, 181 F.3d 627, 628 (5th Cir. 1999) (quoting Underwood, 939 F.2d at

475).  "While the Fifth Circuit has adopted the general rule of law enunciated in

Underwood . . . , the Court has further opined that [summary] dismissal is inappropriate

unless the habeas petitioner has first been afforded the opportunity to amend his pleadings

to provide the evidence necessary to support his claim."  Savoy v. Cain, No. 06-1744,

2008 WL 276542, at *1 (W.D. La. Jan. 29, 2008) (Doherty, J.) (citing Martinez, 181 F.3d

at 629).

In the instant matter, there is no evidence to support Ducros's claim that his lawyers prevented him from testifying.  Although Ducros suggests that he wanted to testify, he has not presented any evidence that might establish this fact.  His self-serving suggestion that he submitted affidavits to counsel is also not supported by the record.  He has submitted no evidence to establish any attempt to present an affidavit to any of his trial attorneys that would support this claim.

The record shows that Ducros simply acquiesced to what appears to have been the sound advice of counsel that he not testify.  The transcript is devoid of any discussion on the record by Ducros or his counsel that Ducros wished to testify or disagreed with counsel's advice.  Ducros's argument, therefore, is in the same posture as that invalidated and rejected in the <u>Underwood</u> case.  There is nothing in this record sufficient to prove a true violation of his right to testify.

For these reasons, Ducros has not demonstrated any deficiency or prejudice resulting from counsel's advice not to testify under the standards set forth in <u>Strickland</u>. There is no violation of the right to testify where the defendant merely acquiesced during trial to his attorney's recommendation that he not testify, even if the defendant decides later, in hindsight, that he should have testified.  <u>Jordan</u>, 34 F.3d at 312.

Even assuming that counsel did in fact advise Ducros not to testify, the record demonstrates that such advice was based on legitimate grounds.  As discussed previously

34

in this report, the evidence and testimony at trial were contrary to the assertions Ducros now makes in support of his self-defense theory. His son David testified that his mother, not Ducros, was holding Moonie while they continued to argue outside. The testimony also established that Ducros cut and stabbed Duncan at least nine times. These wounds, one of which was fatal, occurred during the argument in the front yard. At that time, Duncan was seated on the ground, with Ducros, the aggressor, standing over her, ordering her to get up.

These and many other points of evidence establish that Ducros was not being threatened and if he had been, he became the aggressor in repeatedly cutting and stabbing Duncan, who was defenseless on the ground next to her four-year-old daughter. Nothing in Ducros's proposed testimony would alter the fact that he was the aggressor who injured Duncan multiple times before the fatal stabbing. As discussed thoroughly above, the evidence established under Louisiana law that Ducros was not defending himself.

The evidence also contradicts his suggestion that Jones ran out and hit him before he stabbed Duncan. David confirmed that only his mother and father were outside during the argument and stabbing.[65]

With these contradictions already in the record, placing Ducros on the stand would only emphasize the disparity between his story and the evidence and eyewitness

---

[65]St. Rec. Vol. 6 of 8, Trial Transcript, p. 162 (David Ducros Jr.), 11/12-13/03; .

35

testimony.  He would have been exposed to cross-examination about the numerous cuts and stab wounds, about his character, including his alleged infidelity that led to the argument, about prior criminal convictions, and about his flight from the scene.

The prejudice posed by the likely cross-examination outweighed any benefit his unsubstantiated testimony could have lent to his defense.  As discussed above, there was more than sufficient evidence to support the second degree murder verdict.  Ducros has not demonstrated that, but for counsel's advice not to testify, the outcome of the trial would have been different.  For these reasons, the state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, Strickland.  He is not entitled to relief on this claim.

Ducros has had ample time and opportunity, both while his post-conviction proceedings were pending in state court and during the 17 months that his habeas petition has been pending in this court, to file evidence sufficient to support his allegations that his counsel refused to let him testify.  He has failed to do so, or even to suggest that it is conceivable that he could obtain such evidence.  Under these circumstances, it appears that no further opportunity to obtain such evidence need be provided by this court, as suggested in the Martinez and Savoy decisions cited and discussed above.  Nevertheless, in an abundance of caution, as part of the 14-day objection period following the entry of this report and recommendation, Ducros **IS HEREBY NOTIFIED THAT HE IS**

**BEING PROVIDED WITH ONE FINAL OPPORTUNITY, WITHIN THE FOURTEEN (14) DAYS PROVIDED BELOW, TO FILE ANY ADDITIONAL EVIDENCE CONCERNING THIS CLAIM THAT HE MAY WISH THE COURT TO CONSIDER**. Failure to do so may result in dismissal of this claim with prejudice.

B.      INDEPENDENT TEST OF EXCULPATORY EVIDENCE

Ducros claims that his counsel was deficient in failing to have the knife found near the dumpster tested to establish that the victim cut Ducros before he turned the knife on her. He claims this evidence would have supported a verdict of manslaughter.

Duncan argues that counsel should have had the knife tested to prove that the victim's DNA and his were both on the murder weapon. He suggests that this would have established that Duncan cut him first. There was, however, absolutely no evidence at trial or now that Ducros was cut or injured that day. No one testified that the victim was seen with the knife or that she threatened Ducros with a knife. None of the blood in Ducros's car or on the t-shirt matched his DNA. Even assuming he was cut, Ducros has provided no support for his suggestion that the presence of his DNA could have established that he was cut first by Duncan.

Instead of his innocence, Ducros now argues that his counsel should have conceded that he committed the stabbing, and that it was done in self-defense or that it was only manslaughter. As noted previously in this opinion, the multiple cuts and stab wounds and

37

the other testimony and evidence were more than sufficient evidence to conclude that Ducros was not acting in self-defense.

As for his claim that his counsel should have pushed for a manslaughter verdict, Ducros himself has argued to this court that he wanted to testify to establish and emphasize his "cool reflection" and the non-violent nature of the argument he had with Duncan. Such phrases and proof would be inconsistent with a manslaughter verdict under Louisiana law, tending instead to prove a more serious murder offense. In Louisiana, manslaughter is defined as a "homicide which would be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection."  La. Rev. Stat. Ann. § 14:31(A)(1); State v. Logan, 34 So.3d 528 (La. App. 2d Cir. 2010); State v. Quiambao, 833 So.2d 1103 (La. App. 2d Cir. 2002).  By his own argument, Ducros was cool and calm during the argument.  The evidence at trial also demonstrated his repetitive and intentional acts in stabbing Duncan.

Ducros has not established that his counsel acted unreasonably in failing to have the murder weapon DNA-tested or that, but for counsel's failure, the verdict would have been different.  For these reasons, the state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, Strickland.  He is not entitled to relief on this claim.

38

C.    <u>BOGUS DEFENSE THEORY</u>

Ducros argues that his counsel was ineffective for pursuing the "bogus" defense that a third party, Johnny Green, could have been the source of the unidentified male blood in his car.  He claims that his counsel instead should have pursued a defense to show that Duncan had the knife first and that they were still a couple when the incident occurred.

A defendant's desire to have a specific defense theory presented does not amount to ineffective assistance of counsel on federal habeas review. <u>Johnson v. Cockrell</u>, 301 F.3d 234, 239 (5th Cir. 2002) (quoting <u>Strickland</u>, 466 U.S. at 689) ("[C]ourts must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'").  Instead, "counsel has wide latitude in deciding how best to represent a client."  <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5-6 (2003).

The fact that a defense was not successful does not stand alone to establish deficient performance. <u>Martinez v. Dretke</u>, 99 Fed. Appx. 538, 543 (5th Cir. 2004).  "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." <u>Strickland</u>, 466 U.S. at 689 (citations omitted).

The cross-examination conducted by Ducros's counsel focused on Ducros's innocence of the crime altogether.  Counsel used questions to suggest that Ducros's DNA

was not present in the blood samples and that no one had linked any of his DNA or fingerprints to the scene or the items tested by police.  Counsel attempted further to create doubt concerning Ducros's guilt by suggesting that Johnny Green, a man of the same stature, could have committed the murder.

The verdict reached by the jury indicates that counsel's attempts were not successful.  This does not mean that counsel acted unreasonably. Counsel faced the daunting task of refuting eyewitness testimony that ultimately confirmed that Ducros stabbed Duncan and other evidence showing that Ducros taunted Duncan and cut and stabbed her multiple times.  In light of the overwhelming evidence in possession of the State, counsel pursued defenses that would tend at least to raise doubt as to Ducros's identity and involvement.  Ducros has not made a showing that this strategy fell below constitutional standards, or as mentioned above, that the verdict would have been different had counsel pursued a different theory.

For these reasons, the state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, Strickland.  Ducros is not entitled to relief on this claim.

D.     <u>FAILURE TO CALL DEFENSE WITNESSES</u>

Ducros complains that counsel did not call defense witnesses who could have testified that he and Duncan had not broken up and that he was helping financially to support the family.

"'Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.'" <u>Graves v. Cockrell</u>, 351 F.3d 143, 156 (5th Cir. 2003) (<u>quoting</u> <u>Buckelew v. United States</u>, 575 F.2d 515, 521 (5th Cir. 1978)). "'Failure to present [evidence does] not constitute 'deficient' performance within the meaning of <u>Strickland</u> if [counsel] could have concluded, for tactical reasons, that attempting to present such evidence would be unwise.'" <u>Williams v. Cockrell</u>, 31 Fed. Appx. 832 (5th Cir. 2002) (<u>quoting</u> <u>Williams v. Cain</u>, 125 F.3d 269, 278 (5th Cir. 1997)).

Ducros consistently argues that counsel should have presented evidence that he and Duncan had not ended their relationship and that he regularly was at their apartment. This, of course, is inconsistent with his other argument that Duncan did not want him in the house, she was threatening to end his visitation with the children, and she told him that he could not keep returning after being with other women.

Nevertheless, Ducros identified no witnesses who should have been called. He has not provided any proof that the unidentified witnesses would have testified as he suggests

41

or that their testimony would have been beneficial to his defense.  Without such a showing he has not established that counsel was deficient or prejudicial in failing to call witnesses in his defense at trial.

The state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, <u>Strickland</u>.  Ducros is not entitled to relief on this claim.

E.      <u>REASONABLE DOUBT CHARGE</u>

Ducros alleges that counsel was ineffective in failing to object to the state trial court's reasonable doubt jury charge.  As has already been discussed, the reasonable doubt jury charge given at his trial was not unconstitutional or violative of Supreme Court law. Counsel's failure to make a frivolous or baseless objection is not deficient performance falling below an objective level of reasonableness.  <u>Green v. Johnson</u>, 160 F.3d 1029, 1037 (5th Cir. 1998).  The state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, <u>Strickland</u>.  Ducros is not entitled to relief on this claim.

**<u>ORDER AND RECOMMENDATION</u>**

For all of the foregoing reasons, unless Ducros submits additional evidence as discussed above and required below, it is **RECOMMENDED** that the petition of David Ducros for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

**IT IS ORDERED** that, within fourteen (14) days after being served with this report and recommendation, Ducros must file any additional evidence that he wants the court to consider in support of his allegations that his counsel unconstitutionally refused to let him testify at his criminal trial. Failure to do so may result in dismissal of this claim with prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[66]

New Orleans, Louisiana, this ____25th____ day of April, 2011.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[66]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.